MIGNANO *et al. v.* MACANDREWS *et al.*

CALIFANO *et al. v.* SAME.

*(District Court, S. D. New York.* February 1, 1892.)

**1. CHARTER-PARTY—TO "REPORT AT CUSTOM-HOUSE" DOES NOT INCLUDE RIGHT TO SHIP'S INWARD BUSINESS.**
    A clause of a charter providing that the vessel is to be "reported at the custom-house" by the charterers or their appointee does not give the charterers the right to do the inward business of the ship.

**2. SAME—"INWARD BUSINESS" OF SHIP—STATEMENT OF CASE.**
    A charter provided that the vessel should be reported at the custom-house by the charterers or their appointee, or pay £20 liquidated damages. The master reported to the charterers on the day of arrival, but the latter and their appointee declined to enter the ship unless they should be allowed to do the ship's inward business, which the ship refused. On libel filed by the ship-owner to recover freight, charterers claimed to deduct the £20. *Held,* that the right to do the inward business of the ship could not be allowed the charterer unless plainly indicated in the charter, and that the phrase "to report at the custom-house" did not include the handling of such inward business; hence the ship, in reporting to the charterers, had fulfilled her part of the charter, and the charterers could not be permitted to deduct the £20 from the freight.

In Admiralty. Libels *in personam* by Andrea Mignano and others against Robert MacAndrews and others, and Gaspare Califano and others against the same, to recover a balance of charter hire of two vessels. Decree for libelants.

*Wing, Shoudy & Putnam,* for libelants.
*Wilcox, Adams & Green,* for respondents.

BROWN, District Judge. In June, 1891, two vessels of 506 and 607 tons respectively were chartered by the owners to the respondents at Smyrna for a voyage thence to New York. Both charter-parties were in the same form, the concluding paragraph of which provided that the vessels were "to be reported at the custom-house by MacAndrews & Forbes, 55 Water street, or their appointee, or pay £20 liquidated damages." The vessels were loaded with the charterers' own goods, and bills of lading issued for cargo deliverable to themselves at New York. As the respondents did not do shipping business themselves, they appointed John C. Seager, a ship-broker, to attend to this business. On the day of arrival, the master of each vessel reported to Funch, Edye & Co., who had long acted as agents of the owners in this city, and who were understood to be the consignees of the ship. Their clerk at once went with the masters to confer with Mr. Seager in reference to reporting the vessel, and on the same afternoon and the next morning they had several conversations with Mr. Seager and with Mr. Cuthbertson, one of the respondents' firm, the result of which was that Mr. Seager, under respondents' direction, refused to enter the vessel at the custom-house, either upon the ordinary custom-house brokerage fee of three dollars, or upon the compensation of five cents per ton, unless he was also to have what is called "the inward business of the ship;" that is to say,

the collecting of the freights and any other business in connection with the inward voyage. The nominal charge for doing such inward business is five cents per ton; though sometimes the master collects the bills, and sometimes this nominal charge of five cents per ton is remitted. The reason why the inward business is desired by the ship-broker is, that it practically secures to him the chartering and fitting of the ship for the outward voyage, upon which there is a much more substantial and more profitable compensation.

The evidence leaves no doubt that the respondents and Mr. Seager were unwilling to enter the ship, and at the same time to allow Funch, Edye & Co. to do the ship's inward business; and that the former refused to report the ship at the custom-house upon such conditions. Ships are required to report within 48 hours after arrival. After the above refusals, the ships' captains, accompanied by a clerk of Funch, Edye & Co., went to the custom-house, and, selecting a custom-house broker, had the ships reported and entered at the custom-house in the names of the respondents; and on the following day they received from the latter a "hauling order," that is, an order where to go to discharge the cargoes, under which the vessels were discharged. Upon a demand for the freight provided by the charter, the respondents claimed to deduct the £20 liquidated damages, which the libelants refused to allow. The above libels were thereupon filed, and the amount of freight less those sums has been deposited in the registry of the court.

In the case of *Gallo* v. *MacAndrews*, 29 Fed. Rep. 715, this court sustained a claim to a similar amount of £20 as liquidated damages, as a reasonable provision against the inconvenience and losses which the charterer might sustain in his business through a failure to report the ship promptly at the custom-house. In that case, there was no attempt by the vessel to comply with the stipulation. The master reported to his own ship-brokers, by whom the vessel was entered, and no report was made to the charterers till the following day. In the present cases, the masters reported with reasonable promptness to the charterers on the day of arrival; and the only reason why the entry in the custom-house was not made by the charterers' appointee was, as above stated, because he claimed to annex additional conditions, to which the masters refused their assent. The present cases turn wholly on the question whether these conditions, namely, the right to charge five cents per ton and to do the inward business of the ship, could be properly demanded by the charterers under the provision of the charter above quoted.

On this point my opinion is adverse to the respondents.

There is no ambiguity in the phrase "to report at the custom-house;" it is equivalent to the words "to be entered at the custom-house." Both import an ordinary and familiar act required of the vessel by the Revised Statutes, and by practical necessity done through the action of some custom-house broker. For this simple act, three dollars is the ordinary fee. There is no ambiguity in the words or the phrase used. The evidence does not show any ambiguity, nor any fixed custom or practice in business, either general, or brought home to the knowledge

of the ship-owners, which could add to the phrase so important a clause as doing "the inward business of the ship." The evidence shows on the contrary that upon charters of precisely the same form as the present the practice has long been for the vessels to be entered by the consignee of the ship, and not by the brokers named, and upon no other expression of assent thereto than the signing of a mere "hauling order," telling where the ship should discharge. Mr. Seager's testimony is wholly insufficient to establish the usage alleged, even if in any view competent to change so greatly the meaning of a written instrument.

If the charterers of the ship were to do its inward business, they would be in effect consignees of the ship at this port. This involves a fiduciary relation of great importance between them and the owners. They virtually control all claims in favor of the ship-owner, collect and hold all funds on her account, and adjust and settle all disputes. Presumptively the charterers who load the ship themselves, whose goods are brought in the ship, and in whose favor any counter-claims for damages upon any dispute with the captain would arise, would be the last persons who should be appointed to represent the owners in such relations; since the charterers would thereby be acting in a double and opposite capacity, in which the owners would be deprived of all the ordinary securities for the enforcement of their rights.

The present charter also provided that the "report to the customhouse" might be made by the charterers, or by "their appointees." There is nothing which makes the charterers answerable for the responsibility of such appointees. This would be very harmless as respects the act of reporting at the custom-house, which in itself is an insignificant matter; though promptness in it may be very important to the chartererers, and warrant the stipulation for the small sum of £20 damages if neglected. There is no reason why such an act might not be done by any one whom the charterers should appoint. But to enable the charterers, without responsibility of their own, to appoint persons unknown to the owner to collect and handle the ship's funds, is a power that, if not expressly conferred, should not be upheld by mere presumption, except upon the plainest necessity or very plain implication. In the present case there is nothing in the language of the charter importing any such added powers, and the previous course of business between the parties forbids the supposition of any such intention by the owners. An additional circumstance against the construction contended for is the fact that these charters were on blanks of the respondents' own forms, prepared presumptively by themselves; and they are, therefore, not to be taken as giving important powers not expressed. Other charters executed between the respondents and other parties before this controversy arose, contain an express stipulation for doing the inward business. This is evidence of the practice of the defendants themselves in accordance with the legal presumption, viz., to provide expressly for the inward business where that is intended. I cannot hold such a charter as the present to be of the same force, without such a stipulation, as with it. Decrees for the libelants for the full amount of freight, and costs.